Pantex Oil Corporation, Dissolved v. Commissioner.
Pantex Oil Corp. v. Commissioner
Docket No. 19843.
United States Tax Court
1949 Tax Ct. Memo LEXIS 13; 8 T.C.M. (CCH) 1079; T.C.M. (RIA) 49289; December 19, 1949
*13 Petitioner loaned various sums of money to Krome Corporation in 1942 for which it received unsecured notes, two of which aggregated $85,000. Krome was engaged in mining operations under a contract with Metals Reserve Company, which contract was canceled on November 30, 1943. Krome's operations thereafter ceased and it was liquidated; this liquidation was nearing completion in 1945. Held, the notes aggregating $85,000 upon which nothing has ever been paid became worthless in petitioner's fiscal year ended February 28, 1945, and are deductible as bad debts. R. B. Cannon, Esq., 909-13 Sinclair Bldg., Fort Worth 2, Tex., for the petitioner. D. Louis Bergeron, Esq., for the respondent. BLACK
Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $2,609.96 in petitioner's income tax for the fiscal year ended February 28, 1945, and a deficiency of $3,108.32 in declared value excess profits tax and a deficiency of $43,882.07 in excess profits tax for the same taxable year. These deficiencies are due to two adjustments made by the respondent in the net income as reported by petitioner on its return; as follows: ADJUSTMENTS TO NET INCOME
Net income for declared value excess profits tax computation as disclosed by
return
[64,734.37)
Unallowable deductions and additional income: (a) Bad debts disallowed
$94,467.83
(b) Depletion disallowed
34,439.46
128,907.29
Net income for declared value excess profits tax computation adjusted
$64,172.92
*14 Petitioner contested these adjustments (a) and (b) by appropriate assignments of error. At the hearing the parties stipulated that petitioner was entitled to a deduction for depletion in the amount of $31,318.32. Petitioner at the hearing limited its proof to debts aggregating $85,000 which it claims became worthless in the taxable year. This aggregate is made up of two notes of Krome Corporation in the respective amounts of $75,000 and $10,000. This leaves for our consideration the sole question of whether the notes aggregating $85,000 became worthless in petitioner's fiscal year ended February 28, 1945, so as to constitute a bad debt deduction under section 23 (k) (1) of the Internal Revenue Code. Findings of Fact The facts which were stipulated are so found. Pantex Oil Corporation, hereinafter referred to as petitioner, is a corporation organized on or about October 13, 1937, under the laws of the State of Delaware, with its principal office and place of business located at Fort Worth, Texas. Its returns for the fiscal year ended February 28, 1945, were filed with the collector for the second district of Texas at Dallas, Texas. Petitioner was engaged *15 in oil and gas production. Its capital stock was $10,000 represented by 200 shares of the par value of $50 per share. G. K. Taggart was petitioner's president and he and C. F. Corzelius were the majority stockholders until January 15, 1943, when Corzelius sold his stock to petitioner. Petitioner was dissolved and its charter was surrendered on March 30, 1948. Krome Corporation, hereinafter referred to as Krome, is a corporation organized on or about December 10, 1941, under the laws of the State of Oregon with its principal office and place of business located at Marshfield, Coos County, Oregon. Its capital stock was $30,000, consisting of 400 shares of the par value of $75 per share. Krome was organized for the purpose of extracting and refining low grade chromium ore. On April 3, 1942, William M. Muchow, trustee for U.S. Chromium, Inc., granted to Taggart an option to purchase certain land located in Coos County, Oregon, known as the "Muchow Property" for a consideration of $150,000. The option was subsequently assigned to Corzelius, agent for a joint venture, and on March 31, 1943, was assigned to Krome for $250 cash and notes payable totaling $650,000 issued to Corzelius, *16 agent. On August 3, 1943, Krome elected to purchase the "Muchow Property" for $110,000 and on that date paid U.S. Chromium, Inc., $5,000 in cash, as well as issued notes aggregating $105,000. Krome entered into a contract with Metals Reserve Company, a subsidiary of Reconstruction Finance Corporation, providing for a delivery to Metals Reserve Company of chrome concentrate at $12 per ton, which contract was amended from time to time increasing the amount of tons to be delivered to Metals Reserve Company. Under the amendment of October 31, 1942, the tonnage to be delivered was 180,000 tons, while under the amendment of January 31, 1943, the tonnage was increased to 240,000 tons. Krome did not have sufficient capital with which to operate. It secured the funds with which to build and operate its plants largely by borrowing. Part of the funds so obtained was borrowed from petitioner. The amounts borrowed from petitioner aggregated a total of $135,000, as follows: Date
Amount
Due
January 20, 1942
$75,000
December 31, 1944
October 1, 1942
10,000
December 31, 1944
October 20, 1942
25,000
November 1, 1942
November 13, 1942
25,000
November 23, 1942
On *17 November 6, 1942, and on November 14, 1942, the amounts of $10,000 each were paid on account of the $25,000 note dated October 20, 1942. On or about February 28, 1943, this note was renewed for the balance due in the amount of $5,000 which was dated October 21, 1942, and due and payable on December 31, 1944. The above note dated November 13, 1942, in the amount of $25,000 was renewed and extended to December 31, 1944. The above notes aggregating $115,000 remain unpaid. After securing the necessary funds Krome began the construction of its plant in Southern Oregon which originally was to have been completed in the Fall of 1942. Dur to shortages in materials the plant was not completed and put in operation until May 1943. Its operations continued until November 30, 1943, on which date Metals Reserve Company canceled its contract. On December 10 and 11, 1943, Krome was paid the amount of $510,327.59 by Metals Reserve Company as compensation because of the termination of the contract. On December 15, 1943, in order to forestall the institution of receivership proceedings and afford an opportunity for orderly negotiation with the Government or its agencies for a new contract or, failing *18 to get a new contract, for the orderly liquidation of Krome, a plan of liquidation was proposed as to Krome which plan was approved by G. K. Taggart on January 28, 1944, on behalf of petitioner. Under the plan of liquidation the amount of $510,327.59 received from Metals Reserve Company was to be used to pay off the first mortgage of $418,458.97 due Reconstruction Finance Corporation. The balance of cash in the amount of $91,868.62 and the cash received from the sale of the assets were to be distributed pro rata among certain preferred creditors. The petitioner and certain other creditors were to subordinate their claim to the preferred creditors and make no collection on their indebtedness until the preferred creditors had been paid in full. After the termination of its contract the officers of Krome endeavored to negotiate a new contract with the Government or its agencies which would enable Krome to operate at a sufficient profit to recover its costs and at the conclusion of which the plant would be turned over to the Government for a nominal consideration. Petitioner was informed, however, on or about June 8, 1944, by Metals Reserve Company that the supply of chrome from outside *19 the United States had become abundant and it could not contract for any additional supplies. Petitioner thereafter attempted to secure a loan from Reconstruction Finance Corporation but was informed in September 1944, that there was no possibility of making such a loan. Krome then proceeded to dispose of its assets. On November 30, 1943, when Krome's contract was canceled and during the early part of 1944 most operations for the mining of critical materials were still under way and most of the machinery and equipment used in these operations, particularly of the type owned by Krome, were scarce and in demand. By the end of 1944 a great many of these contracts had been canceled as the Government had accumulated a sufficient supply of most critical metals and the market for such mining machinery and equipment had dropped and there was practically no demand therefor. An experienced officer of Krome Corporation, thoroughly familiar with its plant and equipment, has appraised the assets of that corporation from a realization standpoint as of February 29, 1944, (the beginning of petitioner's taxable year ended February 28, 1945) with the result that he determined such assets to then *20 have had a realizable market value of approximately $735,473.68. Petitioner had current liabilities as of that date of $140,127.34, preferred notes payable pursuant to the liquidation agreement in the amount of $368,169.40, notes due petitioner in the amount of $115,000, and notes due to other stockholders in the amount of $278,730.67. Before the close of petitioner's fiscal year ended February 28, 1944, William S. Hall, who acted as general manager for Krome Corporation and who was a minor stockholder in Pantex Oil Corporation, advised George K. Taggart, president of Pantex Oil Corporation, that the Krome notes held by Pantex would probably liquidate out for about 50 or 60 per cent of their face amount in the event of a sale of Krome assets. Based on this advice Pantex Oil Corporation, in its Federal tax returns for its fiscal year ended February 28, 1944, charged off as a bad debt two notes of Krome Corporation, one dated November 13, 1943, due December 31, 1944, for the sum of $25,000 and the other dated October 21, 1942, due December 31, 1944, for the sum of $5,000. The petitioner in a statement attached to the return explained that these notes were worthless because "Government *21 contract to Krome * * * was cancelled November 30, 1943." Those notes are not involved here. In the early part of September 1944, all negotiations for the disposition of the Krome plant as an entity, or for a contract for the sale of the product of such plant fell through and the responsible officers of Krome Corporation were definitely advised that there was no possibility of disposing of the Krome assets by selling them to the United States Government, or an agency thereof, and further, that there was no possibility of making a loan on these properties or otherwise contracting with respect to them with the Government or any of its agencies. They then proceeded to begin to dispose of all the assets of Krome Corporation at the best price obtainable. The value of Krome's remaining assets on December 31, 1944, was $56,741.44. Petitioner's current liabilities as of this date were $103,827.09, preferred notes payable pursuant to the liquidation agreement of $343,186.07, notes due petitioner in the amount of $115,000, and notes due other stockholders in the amount of $278,730.67. On or about December 31, 1944, Krome conveyed its interest in the mining property located in Coos County, *22 Oregon, to Mark W. Muchow, the seller, for a nominal consideration. In November 1944, C. F. Corzelius, who was one of the principal stockholders of Krome, requested G. K. Taggart to advance additional funds in order to prosecute a claim on behalf of Krome for additional compensation because of the termination of its contract. G. K. Taggart refused as he considered the claim worthless. Thereafter Corzelius decided to prosecute the claim at his own expense and on November 9, 1944, Taggart agreed on behalf of himself and petitioner that if Corzelius collected any additional amounts from the Government he would be entitled, as compensation for his services, to 50 per cent of the amounts paid to petitioner on account of the notes due by Krome. Krome on October 12, 1945, filed with the Reconstruction Finance Corporation, successor to Metals Reserve Company, a claim in the amount of $1,092,590.90 for additional compensation under the Contract Settlement Act of 1944 in connection with the termination of its contract. This claim was denied by the Reconstruction Finance Corporation on November 15, 1945. Krome then filed an appeal with the Appeal Board of the Office of Contract Settlement *23 which claim was denied. Krome thereafter filed a complaint in the District Court of the United States for the Southern District of Texas on October 11, 1946, claiming an additional compensation due to the termination of the contract the amount of $833,135.96, plus profit, interest and settlement expenses or, in the alternative, the amount of $1,092,590.90. The District Court for the Southern District of Texas entered its judgment on April 15, 1948, denying Krome's claim. Krome on August 26, 1948, filed an appeal with the United States Court of Appeals for the Fifth Circuit which appeal, as of the date of the hearing of this proceeding on February 11, 1949, was still pending. Petitioner in its income tax return for the fiscal year ended February 28, 1945, deducted bad debts in the amount of $94,467.83. Included in this amount was the note of Krome in the amount of $75,000 dated January 20, 1942, due December 31, 1944, and the note of Krome in the amount of $10,000 dated October 1, 1942, and due December 31, 1944. Petitioner, in a statement attached to the return, explained that these notes were worthless because "Metals Reserve Company refused Krome Corporation a new contract on June 8, 1944." *24 The note herein in the amount of $75,000 dated January 20, 1942 and due December 31, 1944, and the note in the amount of $10,000 dated October 1, 1942 and due December 31, 1944, became worthless during petitioner's fiscal year ended February 28, 1945. Opinion BLACK, Judge: We have but one issue in this proceeding and that is whether petitioner is entitled to a bad debt deduction in the taxable year aggregating $85,000. This aggregate is made up of two notes: one in the amount of $75,000 dated January 20, 1942, and the other in the amount of $10,000 dated October 1, 1942. The applicable statute is set out in the margin [1] Petitioner, to be entitled to the claimed deduction under section 23(k) (1) of the Code has the burden to establish that the debt became worthless in the fiscal year ended February 28, 1945. As a part of petitioner's burden in establishing that the debt became worthless in the fiscal year ended February 28, 1945, it must show that the debt had some intrinsic or potential value at the close of the preceding fiscal year. See Dunbar v. Commissioner, 119 Fed. (2d) 367. *25 Respondent contends that the petitioner has not sustained its burden in the above respects. He argues: (1) that the debt became worthless during the fiscal year ending February 28, 1944, and (2) in the alternative, that the debt did not become worthless until subsequent to the fiscal year ending February 28, 1945, because after Krome's claim for termination costs had been allowed in part it continued to pursue its claim for additional compensation and an appeal from the judgment of the District Court for the Southern District of Texas denying Krome's claim is still pending in the Court of Appeals for the Fifth Circuit. The evidence establishes that Krome's contract with the Metals Reserve Company was terminated on November 30, 1943, and that on December 10 and 11, 1943, Krome was paid the sum of $510,327.59 as compensation under the termination clause contained in the contract. On December 15, 1943, in order to forestall the institution of receivership proceedings and afford an opportunity for orderly negotiation with the Government or its agencies for a new contract or, failing to get a new contract for the orderly liquidation of Krome, a plan of liquidation was proposed, which *26 was subsequently agreed to, which provided that from the amount of $510,327.59, the amount of $418,458.97 was to be paid to the Reconstruction Finance Corporation which held a first mortgage on Krome's properties. Under the plan of liquidation the balance of cash and the cash received from the sale of its assets were to be distributed pro rata among a group of preferred creditors and the petitioner and certain other creditors were to subordinate their claim until the preferred group had been paid in full. The evidence shows that an experienced officer of Krome has estimated that on February 29, 1944, it had seemed possible that Krome's total assets could be liquidated for around $700,000. Krome had current liabilities of $140,127.34, preferred notes payable pursuant to the liquidation agreement of $368,169.40. If the assets of Krome could be sold for around $700,000 some balance could be paid on account of the notes due petitioner in the amount of $115,000 and the notes due other stockholders in the amount of $278,730.67. We think, therefore, that the evidence tends to show that Krome's notes had some intrinsic value at the close of petitioner's fiscal year ending February 28, 1944. *27 While it may be true, and doubtless was true, that the greater portion of the debt due petitioner was worthless at the end of the fiscal year 1944, the petitioner was not required to make a partial charge-off of indebtedness but could wait and take the entire deduction in the year in which the debt became wholly worthless. E. Richard Meining, 9 T.C. 976 and Moock Electric Supply Co., 41 B.T.A. 1209. The evidence also shows that prior to the close of petitioner's fiscal year ending February 28, 1944, there was some hope, though slight, for the financial improvement of Krome. After Krome's contract was terminated its officers endeavored to negotiate a new contract with the Government or its agencies which would enable Krome to operate at a sufficient profit to recover its costs. The officers were, at first, led to believe that such a contract could be negotiated. However, the officers of Krome were informed on or about June 8, 1944, that the supply of chromium had become abundant and additional supplies would not be contracted for. Krome thereafter attempted to secure a loan from the Reconstruction Finance Corporation which was refused. Krome's officers, *28 after being advised that there was no possibility of a new contract or a loan, proceeded to dispose of its assets. The evidence shows that after March 1, 1944, the market for mining machinery and equipment of the type owned by Krome had dropped considerably because a great many similar contracts for minerals were canceled so that mining machinery and equipment of the type owned by Krome were selling at almost salvage prices. On December 31, 1944, the value of Krome's assets not previously disposed of amounted to $56,741.44, while it had preferred notes payable alone of $343,186.07, thus leaving no assets with which to pay petitioner's notes. Krome had ceased operations after its contract was canceled on November 30, 1943, and had no income. Under the circumstances, we think it is reasonable to hold that the debt became worthless in petitioner's fiscal year ended February 28, 1945. Any prospects of collection thereafter seemed very remote - too remote to be relied upon. Respondent contends, however, in the alternative that the debt did not become worthless in the taxable year as Krome has pursued a claim for additional compensation, and an appeal from an adverse judgment of the District *29 Court for the Southern District of Texas denying Krome's claim is still pending in the Court of Appeals for the Fifth Circuit. It is true that an officer and stockholder of Krome Corporation, in the hope of securing some additional sum or sums from the Government, filed on behalf of Krome and prosecuted at his own expense (petitioner having expressly refused to contribute anything toward such litigation) a claim with Reconstruction Finance Corporation, which Reconstruction Finance Corporation promptly held to be without legal merit. Such individual then began a de novo action in the District Court for the Southern District of Texas and later took an appeal from an adverse decision of the District Court to the Court of Appeals for the Fifth Circuit, where the same was still pending at the time of the hearing in this proceeding. Notwithstanding the filing of such a claim by Krome, we think petitioner is justified in its contention that the whole of its indebtedness against Krome became worthless within its fiscal year ended February 28, 1945. It would require a high degree of optimism on the part of petitioner, or its officers to discern any probability of the ultimate recovery of *30 any amount by Krome under its aforesaid claim under the Contract Settlement Act of 1944. Absent such recovery, the debt of Krome to petitioner was definitely worthless and uncollectible at February 28, 1945. "The taxing act does not require the taxpayer to be an incorrigible optimist." United States v. White Dental Mfg. Co. of Pennsylvania, 274 U.S. 398. On this issue petitioner is sustained. By a reference to the deficiency notice, statement from which is contained in our reference to the Commissioner's adjustments to the return filed by petitioner, it will be seen that the decision in petitioner's favor of the bad debt deduction issue, plus the stipulated depletion to be allowed petitioner, results in no deficiency. Decision will be entered for the petitioner. Footnotes
1. INTERNAL REVENUE CODE. SEC. 23. DEDUCTIONS FROM GROSS INCOME. * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; * * *↩